UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- versus -

EMILY LEITCH,

Defendant.

STATEMENT OF REASONS FOR
ACCEPTING DEFERRED
PROSECUTION AGREEMENT
DISMISSING CHARGES
ENTIRELY

11-CR-00609 (JG)

UNITED STATES OF AMERICA,

- versus -

IAN MCDANIEL,

Defendant.

STATEMENT OF REASONS FOR
ACCEPTING PLEA
AGREEMENT DISMISSING
FELONY CHARGE IN
EXCHANGE FOR PLEA OF
GUILTY TO MISDEMEANOR
AND IMPOSING SENTENCE OF
PROBATION

11-CR-00457 (JG)

UNITED STATES OF AMERICA,

- versus -

ERNESTO NUNEZ,

Defendant.

STATEMENT OF REASONS FOR
IMPOSING SENTENCE OF
PROBATION

11-CR-00039 (JG)

JOHN GLEESON, United States District Judge:

A.  *Introduction*

Everywhere you look federal policy makers are complaining about the rising costs of incarceration.[1]  Last year, in a letter to the United States Sentencing Commission ("Commission"), the Department of Justice ("DOJ") called for a review of federal sentencing policy – "both systemically and on a crime-by-crime basis" – in an effort to rein in prison costs.[2] In Fiscal Year 2012 DOJ's budget for "incarceration and detention grew by several hundred million dollars," and was "on a funding trajectory that will result in more federal money spent on imprisonment and less on police, investigators, prosecutors, reentry, and crime prevention."[3] Despite a sustained increase in federal prison spending, the continued growth in the prison population has resulted in overcrowding.  Our federal prisons are 38% over capacity, and DOJ reports that "[t]his level of crowding puts correctional officers and inmates alike at greater risk of harm and makes recidivism reduction far more difficult."[4]  The Bureau of Prisons projects that the federal prison population will continue to grow through 2020,[5] a forecast DOJ has described as "troubling."[6]

---

[1]      The annual cost of housing a federal prisoner ranges from $21,006 to $33,930, depending on the type of facility.  U.S. GOV'T ACCOUNTABILITY OFFICE, BUREAU OF PRISONS: ELIGIBILITY AND CAPACITY IMPACT USE OF FLEXIBILITIES TO REDUCE INMATES' TIME IN PRISON 19 fig. 3 (2012).  This discussion borrows from *United States v. Diaz*, No. 11-cr-00821-2, 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013).

[2]      Letter from Lanny A. Breuer, Assistant Attorney General & Jonathan J. Wroblewski, Director, Office of Policy and Legislation, to Hon. Patti B. Saris, Chair, U.S. Sentencing Comm'n 5 (July 23, 2012), *available at* http://www.justice.gov/criminal/foia/docs/2012-annual-letter-to-the-us-sentencing-commission.pdf.

[3]      Matthew Axelrod, *Testimony on Behalf of the U.S. Department of Justice before the U.S. Sentencing Commission, February 16, 2012*, 24 FED. SENT'G REP. 348, 348 (2012).

[4]      Breuer & Wroblewski, *supra* note 2, at 6.

[5]      U.S. GOV'T ACCOUNTABILITY OFFICE, BUREAU OF PRISONS: GROWING INMATE CROWDING NEGATIVELY AFFECTS INMATES, STAFF, AND INFRASTRUCTURE 12 (2012) [hereinafter GAO, GROWING INMATE CROWDING].

[6]      Axelrod, *supra* note 3, at 349.

A week after DOJ's letter, the Senate Committee on the Judiciary held a hearing on rising prison costs in the federal and state systems. Chairman Patrick Leahy, in a statement to the Committee, lamented the dramatic increase in federal prison spending over the past five years and called for sentencing reform that would make our "criminal justice system . . . more efficient and effective."[7] In a letter to the Committee, the Sentencing Commission promptly commended it "for holding a hearing on the costs of incarceration in this country."[8] The letter proposed some modest reforms, including that Congress (a) request prison impact analyses from the Commission before enacting criminal penalties; (b) consider a "marginal[ ]" enlargement of the so-called "safety valve" provision, which spares some drug trafficking defendants from harsh mandatory minimum sentences; and (c) reassess DOJ's ability to double those mandatory minimums.[9]

Our federal prison system costs have ballooned because the federal prison population has exploded during the determinate sentencing regime ushered in by the Sentencing Reform Act of 1984 ("SRA").[10] That explosion can be attributed, in substantial part, to the

---

[7]        *Rising Prison Costs: Restricting Budgets and Crime Prevention Options, Hearing Before the S. Comm. on the Judiciary*, 112th Cong. (2012) (statement of Sen. Patrick Leahy), *available at* http://www.judiciary.senate.gov/hearings/testimony.cfm?id=6ea314ce2753398fcd07c38b2296c227&wit_id=6ea314 ce2753398fcd07c38b2296c227-0-4.

[8]        Letter from Hon. Patti B. Saris, Chair, U.S. Sentencing Comm'n, to Patrick J. Leahy, Chairman, S. Comm. on the Judiciary & Charles Grassley, Ranking Member, S. Comm. on the Judiciary 1 (Aug. 7, 2012), *available at* http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Submissions/2012080 7_StC_Prison_Costs.pdf.

[9]        *Id*. at 2.

[10]        In 1984, when the Sentencing Reform Act was passed, the federal prison population was 34,263. U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRISONERS IN STATE AND FEDERAL INSTITUTIONS ON DECEMBER 31, 1984 12 tbl. 1 (1987). By 1994, it was 95,034; by 2004, it was 180,328. U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2004 3 tbl. 3 (2005); U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, CORRECTIONAL POPULATIONS IN THE UNITED STATES, 1994 66 tbl. 5.1 (1996). In 2011, there were 214,774 prisoners in the custody of the federal government. U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, CORRECTIONAL POPULATIONS IN THE UNITED STATES, 2011 8 App'x tbl. 1 (2012). The Federal Bureau of Prisons is now the largest corrections system in the country. U.S. SENTENCING COMM'N, FIFTEEN YEARS OF

increased severity of federal drug trafficking sentences.[11]  In less than a decade, from 1985 to

1991, the length of federal drug trafficking sentences increased by over two-and-a-half times.[12]

This increase in sentence length for drug trafficking offenders "was the single greatest

contributor to growth in the federal prison population between 1998 and 2010."[13]

   Another significant contributor is the dramatic decrease in sentences of probation

since the passage of the SRA.  The Sentencing Commission was supposed to ensure "the general

appropriateness" of probationary sentences for first-time offenders unless they commit "crime[s]

of violence or . . . otherwise serious offense[s]."[14]  Instead, it unilaterally declared in 1987 that

every theft, tax evasion, antitrust, insider trading, fraud, and embezzlement case is "otherwise

serious," and thus no more eligible for a sentence of probation, even when committed by a first-

time offender, than would a crime of violence.[15]  As Professor Kate Stith and Judge José A.

Cabranes observed fifteen years ago, "While before the Guidelines nearly 50 percent of federal

---

GUIDELINES SENTENCING: AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM 40 (2004) [hereinafter FIFTEEN YEAR REPORT].

  [11]  According to the Commission, roughly 94% of all drug offenses are drug trafficking offenses. U.S. SENTENCING COMM'N, 2011 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS 101, fig. 1 (2011) [hereinafter 2011 SOURCEBOOK].

  [12]  FIFTEEN YEAR REPORT, *supra* note 10, at 53 ("The time served by federal drug traffickers was over two and a half times longer in 1991 than it has been in 1985, hovering just below an average of 80 months."); *see also* Paul J. Hofer & Courtney Semisch, *Examining Changes in Federal Sentence Severity: 1980-1998*, 12 FED. SENT. R. 12, 17 (1999) (nearly three-fold increase in time served for drug offenders between 1984 and 1992); GAO, GROWING INMATE CROWDING, *supra* note 5, at app. II ("The average time an inmate served for drug offenses increased 250 percent after 1987, when the U.S. Sentencing Commission revised the U.S. Sentencing Guidelines in order to implement the Sentencing Reform Act of 1984.").  While the average prison term for drug trafficking offenses "decreased by about 20 percent" in the late 1990s, it remained "far above the historic average."  FIFTEEN YEAR REPORT, *supra* note 10, at 53.

  [13]  KAMALA MALLIK-KANE, BARBARA PARTHASARATHY & WILLIAM ADAMS, URBAN INSTITUTE, EXAMINING GROWTH IN THE FEDERAL PRISON POPULATION, 1998 TO 2010 3 (2012).

  [14]  28 U.S.C. § 994(j).

  [15]  U.S. SENTENCING GUIDELINES MANUAL Ch. 1, Pt. A, § 1.4(d) (1987) ("Under present sentencing practice, courts sentence to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, tax evasion, antitrust offenses, insider trading, fraud, and embezzlement, that in the Commission's view are 'serious.'  If the guidelines were to permit courts to impose probation instead of prison in many or all such cases, the present sentences would continue to be ineffective.  The Commission's solution to this problem has been to write guidelines that classify as 'serious' (and therefore subject to mandatory prison sentences) many offenses for which probation is now frequently given.").

defendants were sentenced to probation alone, that figure is now less than 15 percent."[16]  Last week the Commission reported that that figure is now less than six percent.[17]

Apart from the fiscal cost of mass incarceration, but at least as important, is the human cost.  Lives are ruined, families are destroyed, and communities are weakened.  President Barack Obama recently alluded to these costs: "There's a big chunk of that prison population, a great chunk of our criminal-justice system, that is involved in nonviolent crimes.  I think we have to figure out what are we doing right to make sure that th[e] downward trend in violence continues, but also, there are millions of lives being destroyed or distorted because we haven't fully thought through our process."[18]

We can do a lot, right now, to significantly reduce the unnecessary and excessively punitive costs of over-incarceration.  Three reforms in particular have the potential for cost savings – both fiscal and human – that would dwarf those of all of the Commission's suggestions combined.

First, many low-level drug trafficking defendants are receiving the harsh mandatory minimum sentences that Congress explicitly created only for the leaders and managers of drug operations.[19]  As I suggested in *United States v. Dossie*, DOJ can fix this problem by invoking those mandatory sentences only in the roughly 6% of cases where it proves that the defendant was a leader or manager in a drug trafficking offense.[20]

---

[16]    KATE STITH & JOSÉ A. CABRANES, FEAR OF JUDGING: SENTENCING GUIDELINES IN THE FEDERAL COURTS 62 (1998).

[17]    U.S. SENTENCING COMM'N, REPORT ON THE CONTINUING IMPACT OF *UNITED STATES V. BOOKER* ON FEDERAL SENTENCING 5 (2013).

[18]    Michael Scherer, *2012 Person of the Year: Barack Obama, the President*, TIME, Dec. 19, 2012.

[19]    *See United States v. Dossie*, 851 F. Supp. 2d 478 (E.D.N.Y. 2012); *United States v. Vazquez*, No. 09-cr-259, 2010 WL 1257359 (E.D.N.Y. Mar. 30, 2010).

[20]    851 F. Supp. 2d at 485-89.  I calculated this percentage by comparing the number of drug offenders who did not receive an aggravating role adjustment against the total number of drug offenders.  2011 SOURCEBOOK, *supra* note 11, 109 tbl. 40.  In *United States v. Diaz*, 2013 WL 322243, at *6 & n.50, I cited this

Second, low-level drug trafficking defendants who manage to escape mandatory sentences are subjected to excessively severe Guidelines ranges linked directly to those harsh mandatory sentences.[21] As I suggested in *United States v. Diaz*, the Commission can fix this problem by de-linking the Guidelines ranges from the mandatory minimum sentences and crafting lower ranges based on empirical data, expertise, and more than 25 years of application experience demonstrating that the current ranges are not the "heartlands" the Commission hoped they would become.[22]

These reforms would shorten expensive prison terms that are too long. But there is a substantial segment of our prison population that need not have been sent to prison at all, and that's where a third reform comes in: alternative to incarceration programs.[23] These reforms are simple and hardly innovative; they merely adapt to the federal system approaches that many states have used to great effect and with broad bipartisan support.

In this district, we have two such programs. One is the Pretrial Opportunity Program ("POP"), a presentence drug court, of which Emily Leitch and Ian McDaniel are the first graduates. The other is the Special Options Services ("SOS") Program, which provides for intensive presentence supervision of youthful offenders, of which Ernesto Nunez is the most recent graduate.

If these three cases were handled in traditional fashion, with reference only to the Commission's Sentencing Guidelines, Leitch would have been sentenced to at least 37 months, McDaniel to at least 18 months, and Nunez to at least 30 months in prison. These prison

---

figure as 7%, but I was focusing in that opinion on the sub-category of drug offenders for heroin, cocaine, and crack offenses.

[21] *See Diaz*, 2013 WL 322243, at *3-*6.

[22] *Id*. at *11-*16.

[23] I mean the phrase "alternative to incarceration program" to refer to any presentence program that is designed and intended to result in sentences that do not include prison terms.

terms alone would have cost a total of approximately $205,000.[24]  The costs would hardly have ended there, for each defendant would have emerged from prison jobless and facing all the collateral consequences of a felony conviction.  Leitch and McDaniel would have encountered difficulty providing for their children.

Instead, Leitch and McDaniel's sentences were adjourned to allow them to participate in the POP drug court, and Nunez's sentence was adjourned to allow him to participate in the SOS Program.  As discussed more fully below, each has made remarkable progress.

And instead of sending Nunez off to prison, I sentenced him on January 25, 2013 to a term of probation, a sentence both Nunez's attorney *and* the prosecutor agreed was appropriate.  I also sentenced McDaniel to a term on probation on February 13, 2013.  The government not only agreed with that disposition, it was so impressed with McDaniel's turnaround in POP that it had previously agreed to dismiss the felony drug trafficking charge he faced and to replace it with a misdemeanor.  Thus, McDaniel has avoided both prison and a felony conviction.

Leitch will not be sentenced at all.  On February 14, 2013, the day I had set for sentencing, the government announced it had reached a deferred prosecution agreement with Leitch.  As long as Leitch continues to comply with her conditions of release for the next 18 months, the government will dismiss the felony drug trafficking charges against her, one of

---

[24]      This figure is extrapolated from the prison costs data set forth in Leitch and McDaniel's presentence investigation reports, which both stated that one month of incarceration would cost $2,407.78.  (The presentence investigation report for Nunez did not provide prison costs data).  Presentence Investigation Report at 13, United States v. Leitch, No. 11-cr-00609 (E.D.N.Y. Dec. 20, 2012); Presentence Investigation Report at 18, United States v. McDaniel, No. 11-cr-00457 (E.D.N.Y. Jan. 2, 2013).  Pursuant to 18 U.S.C. § 3572(a)(6) and U.S. SENTENCING GUIDELINES MANUAL § 5E1.2(d)(7) (2012), sentencing judges are to consider the expected costs to the government of imprisonment or supervision when determining whether to impose a fine as a component of the sentence.

which she had pled guilty to on February 3, 2012.  I approved the agreement and the withdrawal

of Leitch's guilty plea on the joint application of the parties.  Thus, for Leitch, POP will be a true

diversion program; she will avoid both prison and a criminal conviction.

These results are possible only because the United States Attorney in this district,

Loretta Lynch, fully supports both the POP drug court and the SOS Program.  She is not alone in

her commitment to these alternative to incarceration programs.  Other United States Attorneys,

in California, Connecticut, Illinois, South Carolina, and Washington, have endorsed similar

programs, and indeed they have worked side by side with courts and Federal Defenders to create

them.[25]  Leitch may be the first graduate of a federal presentence program to have felony charges

---

[25]    The Central District of California's Conviction and Sentence Alternatives ("CASA") Program is a presentence program that diverts some participants from the criminal justice system entirely (by dismissal of the charges) and others from prison (through probationary sentences, agreed-upon under Fed.R.Crim.P. 11(c)(1)(C)) upon successful completion of the program.  CASA is jointly administered by the U.S. District Court, U.S. Pretrial Services Agency, U.S. Attorney's Office, and Federal Defender's Office.  *See* United States District Court, Central District of California, *Conviction and Sentence Alternatives (CASA) Program Overview*, http://www.cacd.uscourts.gov/judges-requirements/court-programs/casa (last visited Feb. 28, 2013).  CASA program materials, including the interagency agreement and referral and transfer procedures, are on file with chambers.

The District of Connecticut recently expanded its reentry drug court – the Support Court – into the presentence phase.  The Support Court is jointly administered by the U.S. District Court, U.S. Marshals Service, U.S. Attorney's Office, and Federal Defender's Office.  *See* United States District Court, District of Connecticut, *Support Court*, http://www.ctd.uscourts.gov/support-court (last visited Feb. 28, 2013).  The Support Court Memorandum of Understanding is on file with chambers.

The Central District of Illinois has been operating the Pretrial Alternatives to Detention Initiative ("PADI") for over ten years.  PADI participants are referred by the U.S. Attorney's Office and are treated by a team of representatives from the U.S. District Court, U.S. Probation Office, U.S. Attorney's Office, and Federal Defender's Office.  PADI program materials, including the Program Participation Agreement, are on file with chambers.

The Charleston Division of the District of South Carolina operates the BRIDGE program, a presentence drug court that offers the following incentives to participants: "[P]retrial defendants could receive, based on the U.S. Attorney's Office discretion, a motion for downward departure, reduction in charge to a lesser offense, recommendation for a non-guideline sentence, referral to Pretrial Diversion, or dismissal of the charge."  United States District Court, District of South Carolina, *Charleston Division BRIDGE Program – A Federal Drug Court – Interagency Understanding*, at 2, *available at* http://www.ctd.uscourts.gov/support-court.  BRIDGE is a cooperative effort involving the U.S. District Court, U.S. Probation Office, U.S. Attorney's Office, and Federal Defender's Office.  *See* United States Probation Office, District of South Carolina, *Federal Drug Court*, http://www.scp.uscourts.gov/DrugCourt/default.aspx (last visited Feb. 28, 2013) (featuring links to the Interagency Understanding, Expanded Eligibility Criteria, Initial Referral, and Participant Agreement).

dismissed entirely, but she will soon be joined by others.  More importantly, whether or not charges are dismissed, presentence programs like ours and those in other districts mean that a growing number of courts are no longer reflexively sentencing federal defendants who do not belong in prison to the costly prison terms recommended by the Sentencing Guidelines.

B.      *The Defendants in These Cases*

      1.      *Emily Leitch*

Emily Leitch is 29 years old.  She has lived in Brooklyn her entire life.  Her parents separated when she was four years old due to her father's addiction to alcohol, marijuana, and crack cocaine.  After the separation, her father returned to his native Guyana.  He did not visit Leitch or financially provide for her.  Leitch was raised in poor economic circumstances by her mother, who cared as best as she could for her, but suffered from alcoholism and died in 2002 from cirrhosis.

From approximately age 12 to 16, Leitch was sexually abused by her godfather, who babysat for her while her mother worked.  Leitch has one sibling, a sister, who was convicted of importing cocaine in April 2012.

---

In the Western District of Washington, Judge Ricardo Martinez, who established a drug court as a Superior Court judge in King County, has begun an analogous federal drug court.  The drug court collaborates with the U.S. Attorney's Office and Federal Defender's Office, and it contemplates the vacatur of participants' convictions upon successful completion.  *See* Gene Johnson, *Seattle Gets Specialized Federal Drug Court*, THE SEATTLE TIMES, Dec. 13, 2012, *available at* http://seattletimes.com/html/localnews/2019895985_drugcourt14m.html.

      In an Alternatives to Incarceration program hosted by the New York University School of Law and the Federal Bar Council last spring, Deputy Attorney General James M. Cole specifically mentioned the CASA, Bridge and PADI programs as among those fully supported by DOJ.  James M. Cole, Deputy Attorney General, U.S. Dep't of Justice, Speech at New York University School of Law on Alternatives to Incarceration: The Use of "Drug Courts" in the Federal and State Systems (May 21, 2012), *available at* http://www.justice.gov/iso/opa/dag/speeches/2012/dag-speech-120521.html.

Leitch has been in a relationship with Corey Poole since 2001; they are engaged to be married. She and Poole have three children together: Camanya, age 10; Koreyna, age 7; and Nazir, age 3.

Leitch has an extensive history of substance abuse. She began smoking marijuana daily at age 11. Following her mother's death in 2002, she became addicted to cocaine as well. She snorted it daily, spending approximately $200 per week on the drug. She stole from Poole to support her habit. In 2007 Leitch underwent outpatient treatment for her addictions at Poole's request, but failed to comply with her treatment program. In 2008 she again underwent outpatient treatment, but once again failed to maintain sobriety.

In 2009 Leitch went to Guyana in an attempt to reconcile with her father, who continues to abuse crack. While she was there, her father got high and assaulted her. Nevertheless, in the summer of 2011, Leitch traveled to Guyana to visit her father again, this time with her three children. They were supposed to return to the United States on July 8, 2011, but Nazir fell ill. Leitch changed the date of their return flight, but she could not afford to pay the fees associated with changing the flight. A man who learned of her situation offered to pay those fees and an additional $30,000 if Leitch agreed to transport drugs back to the United States. Leitch agreed.

On July 27, 2011 Leitch arrived at John F. Kennedy ("JFK") International Airport in Queens, New York, aboard a Caribbean Airways flight from Guyana. She was selected for examination by Customs and Border Protection ("CBP") officers. Leitch presented five pieces of luggage. The officers discovered cocaine embedded in the sides of the luggage and in rum bottles and food cans inside the luggage. The net weight of the seized cocaine was 13.2 kilograms.

Leitch was arrested and charged with importing cocaine. She was released that day on conditions that included returning to court two days later with sureties to sign her bond. She returned to court on July 29, 2011 under the influence of drugs. Chief Magistrate Judge Steven M. Gold remanded her. On February 3, 2012 Leitch pled guilty to importing cocaine.

2.  *Ian McDaniel*

Ian McDaniel turned 35 years old last December. Whereas Leitch got off to a rough start in life, McDaniel was more fortunate. He and his two sisters grew up in a stable, loving, two-parent home in Staten Island. It remains a close-knit family; McDaniel and his sisters (and their own families) still live in the same neighborhood where they grew up, as do their parents. McDaniel attended parochial schools and then St. John's University, graduating with a degree in Computer Science. He got married and has two healthy young children. He succeeded professionally, eventually becoming a Senior Vice President in Citibank's Technology Department, where he supervised 80 Citibank employees and various outside consultants.

But in his mid-20s McDaniel developed a corrosive drug habit. Following back injuries in 2004 and again in 2007, he turned to opiate painkillers, and by 2008 he was taking multiple Vicodin or Percocet on a daily basis. In late 2009, he moved on to oxycodone, which he began taking daily, purchasing the drug "on the street." McDaniel attempted to wean himself off of oxycodone on several occasions, receiving prescriptions for Suboxone, but he relapsed each time.

In 2011 McDaniel became involved with a group of individuals on Staten Island who obtained oxycodone prescriptions from physicians by either duping or corrupting them.

McDaniel purchased oxycodone pills from one of these individuals, his friend and co-defendant Steven Punturieri. He typically purchased 15 oxycodone pills at a time on a bi-weekly basis.

On March 29, 2011 the Drug Enforcement Administration ("DEA") observed McDaniel at the home of Punturieri, who was under investigation by the DEA. McDaniel was subsequently pulled over but a search of his car and belongings did not reveal any drugs. Shortly thereafter, a wiretap intercepted McDaniel phoning Punturieri and warning him that there were law enforcement officers watching his home. He assured Punturieri that no drugs were seized from him by the DEA because he had hidden them.

McDaniel was arrested on June 23, 2011 for conspiring to distribute oxycodone. He was released on the day of his arrest on an unsecured bond. He was subsequently indicted on that conspiracy charge. However, on May 18, 2012, pursuant to a plea agreement, the government filed a superseding information charging McDaniel with misdemeanor possession of oxycodone, to which McDaniel pled guilty.

3.    *Ernesto Nunez*

Ernesto Nunez is 20 years old. He was born and raised in modest circumstances in the Bronx until age 15, when he and his parents moved to the Dominican Republic. His mother has been collecting disability benefits since being hit by a car in 2005; his father developed blood poisoning in 2007 from working in a factory and has worked only sporadically since that time. Nunez has three older maternal half-siblings, with whom he is close.

Nunez's mother suspects he has a learning disability. He has a documented history of depression and anger management problems; even before the move to the Dominican Republic, Nunez received counseling for a year while in junior high school.

Nunez began smoking marijuana daily at age 13. Prior to his arrest, he would spend approximately $400 every two weeks, purchasing one to two ounces of marijuana. He would buy it with money provided to him by his mother for other purposes. Nunez was smoking up to ten times per day in the months prior to his arrest. He attempted to stop on multiple occasions, without the benefit of drug treatment, and failed each time.

In December 2010, when Nunez was 18 and a high school student in the Dominican Republic, he wanted to return to New York to visit family and friends. His mother refused to grant him permission to go or to pay for the trip. Nunez decided he would go anyway, and he arranged alternate financing: he agreed to transport a drug trafficker's cocaine-laden suitcase to New York.

On December 23, 2010 Nunez arrived at JFK Airport aboard a flight from the Dominican Republic. During a routine examination by CBP, an officer discovered cocaine in his suitcase. The net weight of the seized cocaine was two and one-half kilograms.

Nunez was arrested and charged with importing cocaine. He was released on December 30, 2010 on a secured bond. On April 5, 2011 Nunez pled guilty to importing cocaine.

C.      *The Guidelines' Treatment of the Offenses*

Leitch and Nunez are both among the drug trafficking defendants that fare best in this district under the Guidelines: couriers arrested at JFK Airport. Pursuant to a DOJ-approved "fast-track" protocol, all such couriers who promptly plead guilty receive a four-level "minimal role" adjustment even though they are held accountable only for the drugs they personally import.[26] Even with this lenient treatment, which is not available to similarly-situated couriers

---

[26]      *See* Memorandum from David W. Ogden, Deputy Attorney General, U.S. Dep't of Justice, to All United States Attorneys, on Authorization for Certain Early Disposition Programs, (May 29, 2009), *available at*

who fly into other cities,[27] and taking into account other adjustments, such as acceptance of

responsibility, Leitch's Guidelines range was 37-46 months and Nunez's was 30-37 months.[28]

<hr />

http://www.fd.org/docs/select-topics---sentencing/doj-memorandum-for-all-united-states-attorneys-from-david-w-ogden-deputy-attorney-general-subject-authorization-for-early-disposition-programs.pdf?sfvrsn=4 (authorizing early disposition program for "drug courier cases arising out of John F. Kennedy International Airport" in the Eastern District of New York).

[27]      The Guidelines Manual cedes to the sentencing judge the determination of whether drug couriers are entitled to a mitigating role adjustment.  In 2001 the Commission resolved a circuit split on the subject by adding commentary to the mitigating role adjustment, stating that a drug trafficking defendant "whose role in th[e] offense was limited to transporting or storing drugs . . . is not precluded from consideration for an adjustment," thus rejecting a Seventh Circuit decision, *United States v. Burnett*, 66 F.3d 137 (7th Cir. 1995), that held otherwise.  U.S. SENTENCING GUIDELINES MANUAL § 3B1.2 cmt. n.3(A) (2012); *id.* at app. C, Vol. III, amend. 635 ("The amendment adopts the approach . . . that § 3B1.2 does not automatically preclude a defendant from being considered for a mitigating role adjustment in a case in which the defendant is held accountable under § 1B1.3 solely for the amount of drugs the defendant personally handled.").  By authorizing a mitigating role adjustment for drug couriers but not stating whether such defendants should actually receive it, the Commission created a regime in which couriers have significantly different Guidelines ranges depending on the airport into which they fly.  John Gleeson, *Supervising Federal Capital Punishment: Why the Attorney General Should Defer When U.S. Attorneys Recommend Against the Death Penalty*, 89 VA. L. REV. 1697, 1705-06 (2003) (comparing routine use of "minimal role" adjustment for drug couriers in the Eastern District of New York with the practice in the Southern District of Florida where couriers "virtually never get such an adjustment").  Informal conversations with a judge and an Assistant Federal Defender in the Southern District of Florida confirm that the disparities described in my 2003 article persist.

          These regional variations in sentencing are neither uncommon nor objectionable.  This is a big, diverse country, and judges, prosecutors and defense lawyers, who almost always grow up professionally in the communities they serve, personify the values of those communities, including the differing ways they perceive and weigh particular types of crimes.  Just as firearm defendants can fare worse in New York, *see, e.g.*, *United States v. Cavera*, 550 F.3d 180, 197 (2d Cir. 2008) (en banc) (upholding above-Guidelines sentence where sentencing judge disagreed with the Guidelines range based, *inter alia*, on "the greater need for deterrence in New York, with its more profitable black market in firearms"), or Puerto Rico, *see United States v. Flores-Machicote*, No. 11-2243, 2013 WL 238768, at *5 (1st Cir. 2013) (upholding above-Guidelines sentence where sentencing judge disagreed with the Guidelines range based, *inter alia*, on the greater need for deterrence in Puerto Rico, where he noted prevalence of violent and gun-related crime), than in other parts of the country, drug couriers fare better in New York than in Miami.  The Sentencing Reform Act expressly contemplated such differences, *see* 18 U.S.C. §§ 994(c)(4) & (7), and the Commission, which overtly facilitates them in the drug courier context, should respect them in other ones.  Besides, any effort to iron them out would succeed only in driving them underground.  *See Panel II: The Effects of Region, Circuit, Caseload and Prosecutorial Policies on Disparity*, 15 FED. SENT'G R. 165, 173 (2003) ("I am dubious about solving the imbalance caused by the Sentencing Guidelines by creating yet more Guidelines – for prosecutors or other participants in trials and sentencing.  To mix a few metaphors: I fear that more legal constraints on the exercise of discretion would drive more of the process underground, and pretty soon we're getting under some pretty ugly rocks.") (remarks by Kate Stith); *see also* STITH & CABRANES, *supra* note 16, at 141-42 (discussing how attempts to limit prosecutorial discretion, including by the Commission, "serve only to drive the exercise of prosecutorial discretion underground and permit discretion to flourish in even less visible and less accountable reaches of the criminal justice system").

[28]      Leitch's calculation was as follows: base offense level 30 (§ 2D1.1(a)(5)); two-level "safety valve" reduction (§ 2D1.1(b)(16)); four-level mitigating role reduction (§ 3B1.2(a)); and three-level "acceptance of responsibility" reduction (§§ 3E1.1(a) & (b)).  Significantly, Leitch's mitigating role reduction also operated to cap

Had they flown into Miami instead of New York, Leitch's range would have been 70-87 months and Nunez's would have been 46-57 months.[29]

McDaniel's Guidelines range is a little more difficult to establish, as his presentence investigation report was not prepared until after he and the Government agreed that he would plead guilty to a misdemeanor possession charge. However, if McDaniel had been convicted of the conspiracy charge on which he was indicted, his range would have been 18-24 months.[30]

D.     *Alternatives to the Guidelines' Incarceration Reflex*

While sentencing courts in this circuit have long considered alternatives to incarceration on an ad hoc basis, this district is among a fast-growing number of federal courts to establish formal alternative to incarceration programs.[31] These programs, and what they have done for Leitch, McDaniel, and Nunez, are discussed below.

---

her base offense level (which would otherwise have been 32) at 30 (§ 2D1.1(a)(5)). Thus, in her case, the "fast-track" policy had the effect of reducing her Guidelines calculation by six offense levels. With a total offense level of 21 and no criminal history, her range is 37-46 months. U.S. SENTENCING GUIDELINES MANUAL, Ch. 5, Pt. A. Nunez's calculation was as follows: base offense level 28 (§ 2D1.1(a)(5)); two-level "safety valve" reduction (§ 2D1.1(b)(16)); four-level mitigating role reduction (§ 3B1.2(a)); and three-level "acceptance of responsibility" reduction (§§ 3E1.1(a) & (b)). With a total offense level of 19 and no criminal history, his range is 30-37 months. *Id.*

[29]     Without the application of a mitigating role adjustment, but applying all other adjustments, *see* note 28, Leitch's total offense level would have been 27 and Nunez's would have been 23.

[30]     McDaniel's calculation was as follows: base offense level 20 (§ 2D1.1(a)(5), based on 8.1 grams of oxycodone, which is the equivalent of 54.27 kilograms of marijuana); two-level "safety valve" reduction (§ 2D1.1(b)(16)); and three-level "acceptance of responsibility" reduction (§§ 3E1.1(a) & (b)). With a total offense level of 15 and no criminal history, his range would be 18-24 months. U.S. SENTENCING GUIDELINES MANUAL, Ch. 5, Pt. A (2012). The base offense level of 20 is derived from the government's sentencing letter. *See* Sentencing Memorandum from Loretta E. Lynch, U.S. Attorney, E.D.N.Y., to John Gleeson Re: United States v. McDaniel, No. 11-457 (Feb. 11, 2013) (filed as ECF No. 187).

[31]     In 1992, the Second Circuit upheld a downward departure from a range of 51-63 months to a sentence of probation based on a narcotics defendant's post-arrest, presentence efforts to overcome her addiction to heroin. *United States v. Maier*, 975 F.2d 944 (2d Cir. 1992). The Court held that a defendant's awareness of his or her drug dependence "and the demonstrated willingness to act to achieve rehabilitation, thereby benefiting the individual and society," is a legitimate reason for departure. *Id.* at 948. The defendant in *Maier* had received various forms of treatment, including two in-patient rehabilitation programs, prior to sentence. Despite several

1. *POP – Presentence Drug Court*

    a. *The Program*

The Board of Judges of this district established POP in January 2012. POP was inspired by sentencing reforms in the states, which have turned to drug courts to help cope with the rising tide of drug offenders in their criminal justice systems over the last few decades.[32] The use of drug courts to divert substance-abusing defendants from prison has produced positive results in the states. Drug courts have raised treatment retention rates and lowered recidivism rates among participants.[33] They have also produced cost savings because defendants who

---

relapses during that period, the sentencing judge concluded that she was making progress toward complete rehabilitation that incarceration would jeopardize. *Id.* at 945-46.

[32] ROSSMAN ET AL., URBAN INSTITUTE, THE MULTI-SITE ADULT DRUG COURT EVALUATION: EXECUTIVE SUMMARY 1 (2011) ("Drug courts emerged spontaneously during the late 1980s and early 1990s in response to burgeoning drug offender arrests and prosecutions that overwhelmed the capacity of numerous courts to expeditiously process such cases."); VERA INSTITUTE OF JUSTICE, DO DRUG COURTS SAVE JAIL AND PRISON BEDS? 1 (2000) (observing that drug courts in the states were "[d]eveloped to cope with the wave of drug offenders that began flooding the system twenty years ago").

[33] *See, e.g.*, STEVEN BELENKO, NAT'L CENTER ON ADDICTION & SUBSTANCE ABUSE AT COLUMBIA UNIV., RESEARCH ON DRUG COURTS: A CRITICAL REVIEW, 2001 UPDATE 7 (2001) ("Drug courts have . . . provided intensive, long-term treatment services to offenders with long histories of drug use and criminal justice contacts, previous treatment failures, and high rates of health and social problems. . . . Drug use and criminal activity are relatively reduced while participants are in the program."); WEST HUDDLESTON & DOUGLAS B. MARLOWE, NAT'L DRUG COURT INST., PAINTING THE CURRENT PICTURE: A NATIONAL REPORT ON DRUG COURTS AND OTHER PROBLEM-SOLVING COURT PROGRAMS IN THE UNITED STATES 9 (2011) ("Seven meta-analyses conducted by independent scientific teams all concluded that Adult Drug Courts significantly reduce crime, typically measured by fewer arrests for new offenses and technical violations. Recidivism rates for Drug Court participants were determined to be, on average, 8 to 26 percentage points lower than for other justice system responses. The best Drug Courts reduced crime by as much as 45 percent over other dispositions.") (internal citations omitted); DOUGLAS B. MARLOWE ET AL., A SOBER ASSESSMENT OF DRUG COURTS 16 FED. SENT'G REP. 153, 153 (2003) ("We know that drug courts outperform virtually all other strategies that have been attempted for drug-involved offenders."); REMPEL ET AL., CENTER FOR COURT INNOVATION, THE NEW YORK STATE ADULT DRUG COURT EVALUATION: POLICIES, PARTICIPANTS AND IMPACTS 2 (2003) (concluding from a study of eleven drug courts in New York that they reduce post-arrest and post-program recidivism); ROSSMAN ET AL., *supra* note 32 (concluding from a comprehensive study of drug courts around the country that they produce "significant reductions" in drug relapse and criminal behavior); VERA, DO DRUG COURTS SAVE JAIL AND PRISON BEDS? *supra* note 32, at 6 ("[T]he body of literature on recidivism is now strong enough . . . to conclude that completing a drug court program reduces the likelihood of future arrest – at least within the first two years.").

successfully complete drug court programs are diverted from prison.[34]  Indeed, in many places these defendants are diverted from the criminal justice system entirely because the charges against them are dismissed upon successful completion of the drug court program.

Another source of inspiration for POP was the large number of *reentry* drug courts in the federal system.  Our late colleague in this district, Judge Charles P. Sifton, created one of the first federal reentry drug courts in 2002.  Participation in these courts, which now operate throughout much of the federal system, occurs post-sentence, after a defendant has served his or her prison term.  The benefit offered to a defendant participating in a reentry drug court is early termination of the supervised release term.  The cost savings to the system accrue from the shortened length of supervision and any reduction in recidivism rates among the participants.

The judges in this district concluded that if the drug court model produces benefits in the reentry context, it has the potential to produce exponentially greater benefits if it is moved up into the *presentence* phase.  The incentive to the participants at that stage is much stronger: they can avoid (or at least shorten) a prison term, and perhaps avoid a conviction altogether.  And the cost savings are much greater because expensive prison terms are avoided.[35]

---

[34]   *See, e.g.*, HUDDLESTON & MARLOWE, *supra* note 33, at 10 ("Drug Courts have proven to be highly cost-effective. . . .  These savings reflected direct and measurable cost-offsets to the criminal justice system resulting from reduced re-arrests, law enforcement contacts, court hearings and the use of jail or prison beds.  When indirect cost off-sets were also taken into account, such as savings from reduced foster care placements and healthcare service utilization, studies have reported economic benefits ranging from approximately $2 to $27 for every $1 invested.  The result has been net economic benefits ranging from approximately $3,000 to $13,000 per Drug Court participant.") (internal citations omitted); ROSSMAN ET AL., *supra* note 32, at 8 ("Drug courts save money through improved outcomes, primarily savings to victims from significantly fewer crimes, re-arrests, and days incarcerated . . .."); VERA, DO DRUG COURTS SAVE JAIL AND PRISON BEDS?, *supra* note 32, at 6 ("The case for savings is compelling.").

[35]   The difference in cost between imprisoning an individual versus supervising them is significant.  In Leitch and McDaniel's cases, the annual cost of imprisonment would have been $28,893, while the annual cost of supervision by pretrial services officers is $2,682 and by probation officers is $3,433.  Presentence Investigation

Participants instead return to their families and communities with the ability to contribute to both, and with their addictions under control.

POP, like other drug courts, is founded on the premise that many substance abusers are arrested for behavior related to their drug or alcohol addictions and, but for those addictions, they may have lived law-abiding lives. POP provides a framework for more intensive supervision of these defendants, combining judicial involvement with the efforts of Pretrial Services Officers and treatment providers throughout a defendant's term of pretrial supervision. Drug courts have demonstrated that judicial involvement in the rehabilitative process can greatly influence a defendant's success in treatment.[36]

All of the participants meet monthly with me, Chief Magistrate Judge Gold, and Laura Fahmy-Tranchina, the Pretrial Services Officer assigned to the program.[37] We sit around a table in the well of Judge Gold's courtroom, which is smaller and more conducive to discussion than the larger, district judge courtrooms. These group meetings address each participant's progress or problems during the preceding months and goals for the upcoming month. The participants support and strengthen each other in these meetings. Leitch was one of ten participants at the time of her graduation.[38]

---

Report at 13, United States v. Leitch, No. 11-cr-609 (E.D.N.Y. Dec. 20, 2012); Presentence Investigation Report at 18, United States v. McDaniel, No. 11-cr-457 (E.D.N.Y. Jan. 2, 2013).

[36] *See, e.g.*, ROSSMAN ET AL., *supra* note 32, at 7 ("The primary mechanisms by which drug courts reduce substance use and crime is through the judge."); *id.* at 8 ("Practices that appear most related to reductions in crime and substance use are judicial status hearings, judicial praise, drug testing, substance abuse treatment, and greater leverage.").

[37] In the Brooklyn courthouse of the Eastern District of New York, judges initially assigned the cases of participating defendants transfer those cases to Magistrate Judge Gold and me. In the Central Islip courthouse, judges initially assigned the cases of participating defendants transfer those cases to Magistrate Judge Gary Brown and Judge Joanna Seybert. Judge Seybert and I are responsible for sentencing our respective participants upon their completion of POP.

[38] There are currently four additional participants in POP in our Central Islip courthouse.

POP allows for defense counsel to negotiate with the government after the participants' rehabilitation occurs and as their sentencing dates approach.[39] These negotiations occur only between defense counsel and the government.[40] All our court has done is ask the government to listen in good faith to counsel for POP participants during such negotiations. The government's handling of these first two cases proves that it has done just that.

The program description explicitly contemplates the possibility that the rehabilitation of the participating defendant might be such that outright dismissal of the charges on the motion of the United States Attorney would be appropriate.[41] That is the outcome the United States Attorney has concluded is appropriate with respect to Leitch. Other participants will not fare as well. McDaniel, for example, had his felony charge dismissed, but the government did so only on the condition that McDaniel plead guilty to a misdemeanor. And I have no doubt there will be future POP dispositions in which the government refuses to dismiss the felony charges; the benefit to defendants in such cases (apart from the significant benefits that flow from successful drug treatment) will be limited to the consideration of POP participation in determining whether (and, if so, for how long) the participant will be sentenced to prison.

b.     *Leitch's Participation in POP*

As mentioned above, Leitch was remanded on July 29, 2011 for appearing at court under the influence of drugs. She was released on August 12, 2011 on the condition that she report directly to long-term residential drug treatment at Samaritan Village in Queens, New

---

[39]     In other programs, such as the CASA program in the Central District of California, require participants to agree to a precise disposition of the case (dismissal or probation) upon entry into the program.

[40]     *See* Fed.R.Crim.P. 11(c)(1) (precluding court involvement in plea discussions).

[41]     U.S. PRETRIAL SERVICES AGENCY, EASTERN DISTRICT OF NEW YORK, PRETRIAL OPPORTUNITY PROGRAM 2 (2012), *available at* https://www.nyed.uscourts.gov/sites/default/files/forms/POPDescription01112012.pdf ("Indeed, this program envisions that the United States Attorney might agree in some cases that the case should be dismissed entirely.").

York.  She remained there until July 2012, when she commenced outpatient drug treatment at the same facility.  While in treatment, Leitch participated in individual and group counseling.  She also completed an intensive treatment course, which uses cognitive behavioral therapy to focus on destructive thinking patterns and promote positive change while in treatment.  Leitch was discharged from treatment on November 14, 2012.  She has been drug-free for 18 months.

As she was getting her drug problem under control, Leitch proceeded to get the rest of her life on track.  Determined not to go home until she was ready to care for her three children, she took a parenting course in September 2011.  She studied diligently for her GED test in December 2011, but failed.  She studied harder, took the test again in March 2012, and passed.

Leitch was also determined to get a job as a bus driver, so she studied for and passed the four-part written test for a Commercial Driver's License in March 2012.  In May 2012 she took the road test and passed that as well.  She got a job in June 2012 driving a bus, only to get fired a month later.  She took the setback in stride, and looked for and found another job driving a bus.  She now commutes by subway and bus two hours each way to her job on the border of Queens and Nassau County.

Leitch has been a critical member of our monthly POP meetings.  She encourages her colleagues in the program, offers them advice, and sometimes chastises them.  She has taught them by example how to deal with disappointments without relapsing.  Though her drug problem is firmly under control, she regularly attends Narcotics Anonymous and Alcoholics Anonymous meetings.  According to Officer Fahmy-Tranchina, who supervises all of the POP participants, "Ms. Leitch has demonstrated that hard work, coupled with a positive attitude and determination,

can change the course of a life that was spiraling downward due to addiction. It has been a pleasure to work closely with Ms. Leitch and witness her recovery."[42]

c.  *McDaniel's Participation in POP*

McDaniel was released on bond on June 23, 2011, the same day he was arrested. He entered outpatient drug treatment shortly thereafter, which he completed successfully in February 2012. He has been drug-free for more than 19 months.

McDaniel faced significant obstacles on his road to recovery. His arrest cost him his job and his marriage; Citibank suspended him without pay and his wife promptly filed for divorce. But he worked in construction with his father, remained active in the lives of his children during a turbulent period for them, and fought for months to get his job back. To the extent he felt comfortable discussing these personal issues in the monthly POP meetings, McDaniel did so. He found support in fellow POP participants, and the maturity and determination he demonstrated throughout the program was an example for them.

Five months into McDaniel's participation in the program, the United States Attorney agreed to dismiss the felony charge in exchange for McDaniel's plea of guilty to a misdemeanor possession charge. With the assistance of his attorney, McDaniel was then able to resume his position at Citibank. Officer Fahmy-Tranchina's final POP report for McDaniel concludes as follows:

> Ian made an extremely positive adjustment to supervision. He remained committed to his recovery and was driven to reclaim his family's respect, career, and former lifestyle. Ian always displayed a maturity and seriousness about the gravity of the instant offense and his desire to lead a productive and law-abiding lifestyle.[43]

---

[42]     Monthly Status Report RE: Emily Leitch from Laura Fahmy-Tranchina, U.S. Pretrial Services Officer (Jan. 23, 2013) (on file with chambers).
[43]     Monthly Status Report RE: Ian McDaniel from Laura Fahmy-Tranchina, U.S. Pretrial Services Officer (Jan. 23, 2013) (on file with chambers).

2.  *SOS – Intensive Presentence Supervision of Youthful Offenders*

a.      *The Program*

The U.S. Pretrial Services Agency established the SOS Program in January 2000. The program was the brainchild of several Pretrial Services Officers and Judge Jack B. Weinstein, who believed that many youthful offenders might benefit more from intensive supervision and access to services than from pretrial detention.[44]  It targets non-violent juvenile and young adult defendants, providing them with access to education, training and counseling that may have been unavailable to them prior to their arrest, and that can provide the foundation for them to lead law-abiding lives.[45]  Pretrial Services Officers draw on a wide variety of community, educational, and vocational resources to provide such services to SOS Program participants.

For many years the SOS Program operated without formal judicial involvement. Rather, SOS Program participants worked closely with Pretrial Services Officers, who would attend scheduled court hearings and provide status reports to the assigned district judge.  But in January 2013, the program underwent restructuring to combine regular meetings with judicial officers with the efforts of Pretrial Services Officers over the course of a defendant's term of pretrial supervision.[46]  In this new iteration of the program, SOS Program participants will attend

---

[44]      As discussed above, the states were pioneers of the drug court.  But the states have also been ahead of the federal government in experimenting with problem-solving courts more generally, of which the drug court is but one model.  *See generally* VERA INSTITUTE OF JUSTICE, THE CONTINUING FISCAL CRISIS IN CORRECTIONS: SETTING A NEW COURSE 18 (2010).  Another problem-solving court model is one that addresses youthful offenders, like the SOS Program.  *See generally* CENTER FOR COURT INNOVATION, *Juvenile Justice*, http://www.courtinnovation.org/topic/juvenile-justice (last visited Feb. 28, 2013) (featuring a research section with links to articles discussing a variety of state problem-solving courts addressing youthful offenders).

[45]      The term "young adult" contemplates defendants between the ages of 18 and 25.  The SOS Program may also accept older defendants on a case-by-case basis.

[46]      For a description of the SOS Program prior to restructuring, *see United States v. Zimmerman*, No. 10-cr-598, 2012 WL 3779387 (E.D.N.Y. June 19, 2012).  This restructuring occurred with the blessing of the U.S. Pretrial Services Agency and the approval of our Board of Judges.

monthly meetings with Pretrial Services Officer Amina Adossa-Ali and Magistrate Judge Joan M. Azrack or Magistrate Judge Cheryl L. Pollak.[47] This judicial involvement is designed to enhance each participant's support system and encourage compliance with the goals of the program.

Unlike POP, the SOS Program did not originally contemplate negotiations between defense counsel and the government following a defendant's participation in the program. Instead, at sentencing, defense counsel typically argued for leniency, pointing to the defendant's record in the program. The Pretrial Services Officer supervising that defendant would also advise the sentencing judge of the defendant's progress in the program and provide advice regarding the sentencing (in recent years that has been Officer Adossa-Ali). In the newly restructured program, Magistrate Judges Azrack and Pollak will also be in the position "to offer insights to the assigned district judge with respect to the defendant's accomplishment while participating in the program."[48]

b.    *Nunez's Participation in the SOS Program*

Nunez was released on bond on December 30, 2010, one week following his arrest. His early participation in the SOS Program was rocky. He enrolled in GED classes and vocational training. He also began receiving mental health treatment to address his depressive symptoms and anger management issues. At the same time, Nunez tested positive for marijuana

---

[47]    Judge Azrack and Judge Pollack will each conduct monthly meetings with half of the SOS Program participants. The structure of these meetings will be more formal than that of POP meetings. Whereas POP participants sit around a table in the well of Judge Gold's courtroom, SOS Program participants will sit in the jury box. Each SOS Program participant will exit the jury box to speak one-on-one with Judge Azrack or Judge Pollack regarding his or her progress. Following the conclusion of these individual conversations, the judges will open up the meeting for a group discussion among the participants.

[48]    U.S. PRETRIAL SERVICES AGENCY, EASTERN DISTRICT OF NEW YORK, SPECIAL OPTIONS SERVICES PROGRAM 2-3 (2013). POP participants have their cases reassigned to me and Judge Gold, at least until the program grows large enough that other judges will join us. By contrast, the case of an SOS Program participant remains with the initially assigned district judge, who is responsible for sentencing the participant.

on two occasions and exhibited difficulty complying with restrictions on his travel.  His attitude was combative and defensive.

By the time of sentencing, two years later, Nunez had, as his attorney observed, "done a 180."[49]  He completed his GED studies and sat for the GED test in July 2012.  He failed, but, undeterred, he re-enrolled in GED classes.  He sat for the test again in November 2012, and passed.  He obtained several vocational certifications, including in solar paneling and electrical trouble shooting.  He has been drug-free for 18 months.

In her November 14, 2012 status report, Officer Adossa-Ali observed that while early meetings with Nunez "were stressful . . . because they were focused on addressing noncompliance," later meetings had transformed into Nunez "reporting his weekly accomplishments or obstacles, discussing current and future plans, and reflecting on how much his life has changed during the course of supervision."[50]  She noted that Nunez's mother had also remarked on his change in attitude and expressed her pride in his accomplishments under supervision.[51]  At sentencing, Officer Adossa-Ali reiterated these remarks: "Mr. Nunez has made a complete turnaround.  He was one of my most difficult cases to supervise just because he was immature and very stubborn and did not take well to constructive criticism.  But through a lot of work and effort, . . . he's a completely [ ] different person."[52]  And Nunez had this to say to the court during his sentencing:

> I . . . want to appreciate you giving me another opportunity to show
> that I'm not just a statistic.  I actually rose above this situation and
> I made the better of it, and not think of the negative side of it, but

---

[49]  Sentencing Tr. 3:16, United States v. Nunez, No. 11-cr-00039, Jan. 25, 2013.
[50]  Addendum to the Pretrial Supervision Status Report Dated July 25, 2012 RE: Ernesto Nunez from Amina Adossa-Ali, U.S. Pretrial Services Officer (Nov. 14, 2012) (on file with chambers).
[51]  Id.
[52]  Sentencing Tr. 4:10-14, United States v. Nunez, No. 11-cr-00039, Jan. 25, 2013.

just striving to be a better person, and be somebody tomorrow that I probably thought I wasn't going to be . . . .[53]

E.   *Alternatives to Incarceration are Appropriate for a Substantial Segment of the Federal Caseload*

A popular misconception is that federal defendants face charges that are too serious for federal courts to consider alternatives to incarceration.  In a 2006 report on the feasibility of federal drug courts, DOJ concluded that such courts were inappropriate because "[s]tate courts already handle the vast majority of nonviolent, substance abusing offenders."[54]  By contrast, the report noted, "most U.S. Attorneys' Offices have screening guidelines in place to ensure that they only take the most serious drug and violent crime cases generated by law enforcement agencies and local task forces."[55]

The case mix in federal courts is certainly different than that in state courts.  But anyone who believes that the federal system deals only with "the most serious drug and violent" offenders isn't familiar with the federal criminal docket.  The make-up of the federal prison population bears this out.  In 2011 only 7.6% of federal prisoners were incarcerated for violent crimes.[56]  The bulk of the federal prison population is made up of drug offenders; in 2011, about half of all federal prisoners were incarcerated for drug offenses.[57]  And they are mainly non-violent, low-level offenders.  In 2011 roughly 84% of drug defendants had no weapon involved

---

[53]   *Id.* 6:21-7:2.

[54]   U.S. DEP'T OF JUSTICE, REPORT TO CONGRESS ON THE FEASIBILITY OF FEDERAL DRUG COURTS 18 (2006).

[55]   *Id.*

[56]   U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2011 29 app. tbl. 12 (2012) [hereinafter PRISONERS IN 2011].

[57]   SOURCEBOOK OF CRIMINAL JUSTICE STATISTICS ONLINE tbl. 6.0023.2011, http://www.albany.edu/sourcebook/pdf/t600232011.pdf (last visited Feb. 15, 2013). The Sourcebook cites an exact figure of 50.7%, but the DOJ Bureau of Justice Statistics cites a figure of 48%.  PRISONERS IN 2011, *supra* note 56, at app. tbl. 12.

in the offense,[58] and more than half of drug defendants (53%) had a criminal history category of I, signifying a minor or no criminal history.[59]  And only 6% of drug defendants could be classified as managers or leaders, *i.e.* individuals occupying the highest rungs of a drug enterprise.[60]

The incidence of substance abuse is high among the federal prison population. According to a 2004 DOJ report, roughly 63% of all federal prisoners identified as regular drug users and 45% met the criteria for drug dependence or abuse.[61]  About 19% of all federal prisoners committed their offense to support their drug habit.[62]  Among drug offenders, about 52% met the criteria for drug abuse or dependence, 57% reported drug use in the month before the offense, and 32% reported drug use at the time of the offense.[63]  About 25% of drug offenders committed their offense to support their drug habit.[64]

DOJ itself has repudiated its 2006 outlook.  Last year Deputy Attorney General James Cole had this to say: "The federal criminal justice docket is quite different from those in

---

[58]    2011 SOURCEBOOK, *supra* note 11, at tbl. 39.  I am using the presence of a weapon as a crude proxy for determining whether or not a particular defendant's offense behavior was violent.

[59]    *Id.* at tbl. 37.  A 2004 Bureau of Justice Statistics report found that 37.5% of drug offenders had no criminal history whatsoever.  Among those with prior criminal histories, only about 16% were violent recidivists. U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, DRUG USE AND DEPENDENCE, STATE AND FEDERAL PRISONERS, 2004 4 (2006) [hereinafter DRUG USE AND DEPENDENCE].  Nearly two decades ago DOJ conducted a study evaluating "low-level" drug offenders – *i.e.* those "with a minimal or no prior criminal history whose offense did not involve sophisticated criminal activity and whose offense behavior was not violent" – in the federal prison system.  The study concluded that roughly 36% of all drug offenders could be classified as "low-level."  When restricting the population further to those offenders with no prior criminal history, DOJ found that such offenders still constituted roughly 28% of all drug offenders.  U.S. DEP'T OF JUSTICE, NAT'L INST. OF JUSTICE, AN ANALYSIS OF NON-VIOLENT DRUG OFFENDERS WITH MINIMAL CRIMINAL HISTORIES 2-3 (1994).

[60]    2011 SOURCEBOOK, *supra* note 11, at tbl. 40; *see also* note 20.

[61]    DRUG USE AND DEPENDENCE, *supra* note 59, at tbl. 2.  These numbers bear a stark contrast to those of the general population, where only about 2% of U.S. adults met the criteria for drug dependence or abuse in this time period.  *Id.* at 7.  ("State and Federal prisoners were more likely than other adults in the U.S. resident population to meet the criteria for drug dependence or abuse.").

[62]    *Id.* at 6.

[63]    *Id.* at tbls. 4 & 6.

[64]    *Id.* at 6.

most states, and as a result, proportionately fewer federal defendants will be eligible for diversion from prosecution. . . .  Nonetheless, there are low-level offenders in the federal criminal justice system for whom an alternative sanction may be appropriate."[65]  Cole went on to acknowledge DOJ's support for amendments to the Sentencing Guidelines "to permit the use of drug or mental health treatment as an alternative to incarceration for certain low-level offenders" and changes to "its own policies – codified in the U.S. Attorneys' Manual – to make alternatives to incarceration more available."[66]

Despite the small scale of existing federal alternatives to incarceration, they already involve defendants in substantial enough numbers to demonstrate their need and their potential for enormous cost savings.  In the aggregate, these programs have involved roughly 380 participants.[67]  Several of the programs have demonstrated success.  The PADI program in the Central District of Illinois, which has been in existence since 2002, has had 67 defendants graduate successfully from the program, resulting in a successful completion rate of roughly 87%.[68]  As of May 2012, the program had helped the government save nearly $5.5 million.[69]  As

---

[65]     Cole, *supra* note 25.  Last year at an American Bar Association event Justice Antonin Scalia commented on the "nickel and dime" criminal cases overloading the federal criminal docket: "This stuff is just pouring into the federal courts.  That's not what the federal courts were set up for."  *Scalia: Routine Criminal Cases Clog Federal Courts*, ASSOCIATED PRESS, Feb. 4, 2012.

[66]     Cole, *supra* note 25.

[67]     To date, there have been 14 participants in POP, 212 participants in SOS (22 are current participants), 56 participants in CASA, 87 participants in PADI, 11 participants in BRIDGE, and a handful of participants in the brand new drug court in the Western District of Washington.  These figures are drawn from conversations with judges, probation officers, prosecutors, and defenders involved in administering these programs as well as internal memoranda shared by these individuals.

[68]     A total of 87 participants have participated in the program; 14 participants are currently in the program.  E-mail from Darrell Hite, Senior U.S. Probation Officer, U.S. Probation Service, Central District of Illinois, to John Gleeson (Feb. 22, 2013, 4:42 EST) (on file with chambers).  As of May 2012, there were 57 defendants who had successfully completed the program.  27 defendants received a sentence of diversion, 27 received sentences of time served with supervised release, 2 defendants had their charges dismissed entirely, and 1 defendant graduated but had not yet been sentenced.  (Details about the disposition of cases for the additional 8 defendants who have successfully completed the program since May 2012 are not yet available).  Memorandum on Pretrial Alternatives to Detention Initiative (PADI) Program from Darrell Hite, Senior U.S. Probation Officer, U.S.

noted above, the participation of Leitch, McDaniel, and Nunez in POP and the SOS Program in this district has not only turned their lives around, but also avoided a combined $205,000 in imprisonment expenditures.[70]

Nevertheless, because of the small number of districts in which they operate (and because some are pilot programs with limited participants), existing federal alternatives to incarceration necessarily operate on a small scale. The number of participants in these programs pales in comparison to the enormous number of individuals prosecuted and sentenced to federal prison every year, a substantial segment of whom are eligible for alternatives to incarceration.[71] In recognition of this incongruence, DOJ has wisely pledged to consider how to "expand these programs on a large scale" and "how we will put drug courts within reach of every individual who needs and would benefit from these programs."[72]

Finally, it bears emphasis that when a judge chooses between a prison term and probation, she is not choosing between punishment and no punishment. Probation is less severe than a prison term, but both are punishment. And as the Supreme Court has recognized, probation is *significant* punishment:

> We recognize that custodial sentences are qualitatively more
> severe than probationary sentences of equivalent terms. Offenders

---

Probation Service, Central District of Illinois, to John. A. Gorman, U.S. Magistrate Judge (May 17, 2012) (on file with chambers); *see also* Cole, *supra* note 25 (citing these numbers).

[69]     Memorandum from Hite to Gorman, *supra* note 68.

[70]     There are obviously costs associated with operating these programs and I do not purport to be undertaking a detailed cost-benefit analysis. However, the relative costs of imprisoning an individual versus supervising them strongly suggest that significant cost savings will accrue from diverting defendants from prison. In Leitch and McDaniel's cases, the annual cost of imprisonment would have been $28,893, while the annual cost of supervision by pretrial services officers is $2,682 and by probation officers is $3,433. Presentence Investigation Report at 13, United States v. Leitch, No. 11-cr-609 (E.D.N.Y. Dec. 20, 2012); Presentence Investigation Report at 18, United States v. McDaniel, No. 11-cr-457 (E.D.N.Y. Jan. 2, 2013).

[71]     Cole, *supra* note 25 ("Any given federal drug court graduation may involve only 10-15 offenders annually – which is clearly small-scale when considering our current prosecution and imprisonment statistics.").

[72]     *Id*.

> on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual 'special conditions' imposed by the court.[73]

In addition to standard and special conditions, there is an array of alternative sanctions – home confinement, community service, and fines, for example – that allow judges to impose enhanced (and sometimes even constructive) punishment without sending the defendant to prison.[74]

F.      *The Need for Institutional Support and Study of Alternatives to Incarceration*

DOJ is not alone in understanding the unnecessary costs of mass incarceration and in supporting alternatives to incarceration. In a 2003 speech to the American Bar Association ("ABA"), Justice Anthony Kennedy challenged the legal profession to address the problem of mass incarceration. He stated that the sheer scale of the American criminal justice system led to the conclusion that "[o]ur resources are misspent, our punishments too severe, our sentences too long."[75] He urged the ABA "to help start a new public discussion about the prison system" and "to instruct appropriate committees to study these matters."[76]

The ABA answered Justice Kennedy's call. In 2003 it established the Justice Kennedy Commission with the goal of investigating the state of sentencing and corrections in the United States and issuing recommendations to address mass incarceration. A year later the ABA

---

[73]      *Gall v. United States*, 552 U.S. 38, 48-49 (2007).

[74]      MICHAEL TONRY, SENTENCING MATTERS 132 (1996) ("[F]or offenders who do not present unacceptable risk of violence, well-managed intermediate sanctions offer a cost-effective way to keep them in the community at less cost than imprisonment and no worse later prospect for criminality.").

[75]      Anthony M. Kennedy, Associate Justice, Supreme Court of the United States, Address at the ABA Annual Meeting (Aug. 9, 2003), at 4, *available at* http://www.abanow.org/2003/08/speech-by-justice-anthony-kennedy-at-aba-annual-meeting/.

[76]      *Id*. at 6-7.

House of Delegates approved a series of policy recommendations proposed by the Kennedy

Commission, including that the federal government "[s]tudy and fund treatment alternatives to

incarceration for offenders who may benefit from treatment for substance abuse and mental

illness" and "[a]dopt diversion or deferred adjudication programs that, in appropriate cases,

provide an offender with an opportunity to avoid a criminal conviction."[77]  In 2007 the ABA

House of Delegates approved another series of policy recommendations, reiterating its support

for alternatives to incarceration, including community supervision programs; deferred

adjudication, deferred sentencing, and diversion options; and community-based treatment.[78]

These recommendations were endorsed by the National District Attorneys Association, the

National Association of Criminal Defense Lawyers, and the National Legal Aid and Defender

---

[77]     ABA JUSTICE KENNEDY COMMISSION, REPORTS WITH RECOMMENDATIONS TO THE ABA HOUSE OF DELEGATES 10 (2004).  These recommendations were based on the Commission's conclusions, after a year of study, that:

- a steady increase in incarceration rates does not necessarily produce a reduction in crime rates
- in the 1980s and 1990s the majority of new prisoners were nonviolent offenders
- some jurisdictions have reduced crime rates to a greater extent and with less reliance on sentences of incarceration than other jurisdictions
- the racial disparities in sentences of incarceration are of great concern
- the need for incarceration of nonviolent offenders may have been exaggerated in the past
- some rehabilitative alternatives appear to work
- the overall costs of incarceration – to families and the community as well as the offender – are too often overlooked or understated when the costs and benefits of incarceration are weighed

*Id*. at 23-24.

[78]     ABA COMMISSION ON EFFECTIVE CRIMINAL SANCTIONS, SECOND CHANCES IN THE CRIMINAL JUSTICE SYSTEM: ALTERNATIVES TO INCARCERATION AND REENTRY STRATEGIES 10 (2007).  The Commission on Effective Criminal Sanctions succeeded the Kennedy Commission.  These recommendations were based on "testimony taken by the Commission, and its field findings," which "establish[ed] the beneficial effects, in terms of reducing recidivism, of programs providing alternatives to incarceration and a conviction record."  The Commission further concluded that "these programs . . . should be open to all but the most serious offenders" and "that if these programs become more widely known they can be emulated to good effect across the country, and that this will not only reduce the prison population but will also reduce the incidence of criminal behavior and enhance public safety."  *Id*. at 15.

Association.[79]  In addition, the ABA has repeatedly testified before the Sentencing Commission, highlighting the need for the Commission to expand the use of alternatives to incarceration.[80]

The Federal Judiciary has also voiced its support for expanding alternatives to incarceration.  In response to a 1996 survey by the Federal Judicial Center, which asked whether the Guidelines appropriately identify offenders who should be eligible for alternatives to incarceration, nearly two-thirds of federal district judges and chief probation officers stated that more offenders should be eligible for such programs.[81]  Nearly two-thirds of district judges and over half of chief probation officers responded that alternatives to incarceration should be made available to first-time offenders generally and to offenders with extenuating circumstances, such as illness, disability, or dependents.[82]  And nearly half of district judges and over half of chief probation officers responded that alternatives to incarceration should be made available to non-violent offenders generally.[83]

In a 2002 survey conducted by the Sentencing Commission, over half of district judges reported favoring greater sentencing alternatives in drug trafficking cases, including

---

[79]     Margaret Colgate Love, Consulting Director, ABA Commission on Effective Criminal Sanctions, Testimony Before the United States Sentencing Commission (Nov. 14, 2007), at 3-4, *available at* http://meetings.abanet.org/webupload/commupload/CR209800/otherlinks_files/USSCPublicHearing.pdf.

[80]     *Id.*; James E. Felman, Co-Chair, Criminal Justice Section Committee on Sentencing, American Bar Association, Testimony Before the United States Sentencing Commission, at 9 (Mar. 17, 2010) ("[T]he ABA has long supported the use of alternative sentences for offenders whose crimes are associated with substance abuse or mental illness and who pose no substantial threat to the community.  The ABA's analysis of alternative sentencing programs in other jurisdictions indicates that such programs are often associated with reduced recidivism rates.  We encourage the Commission to make the greatest use of such treatment possible because we believe this will maximize the opportunities for better outcomes, reduced recidivism, and the avoidance of unnecessary incarceration.").

[81]     MOLLY TREADWAY JOHNSON & SCOTT A. GILBERT, FEDERAL JUDICIAL CENTER, THE U.S. SENTENCING GUIDELINES: RESULTS OF THE FEDERAL JUDICIAL CENTER'S 1996 SURVEY 15 (1997).

[82]     *Id.* at 15-16  ("Sixty-three respondents specified other classes of offenders for whom alternatives to incarceration should be made available, including youthful offenders and first-time nonviolent offenders with certain extenuating circumstances.").

[83]     *Id.* at 15.

straight probation, probation-plus-confinement, and "split" sentencing options.[84] More recently, in response to a 2010 Commission survey, over half of district judges again favored greater sentencing alternatives in drug trafficking cases.[85] Over half of district judges also favored greater sentencing alternatives in assault cases, and an overwhelming number of district judges favored greater sentencing alternatives in fraud (80%), theft (83%), and child pornography receipt and possession cases (74% and 83%).[86]

The Commission has long flirted with the idea of expanding alternatives to incarceration. As far back as 1990, then-Commissioner Helen Corrothers chaired the Alternatives to Imprisonment Project, which, together with the Judicial Conference of the United States, "submitted detailed reports to the Commission recommending an increase in the number of existing intermediate punishments, expansion of the pool of eligible defendants, and a general increase in district courts' flexibility in sentencing certain offenders."[87] In 2008 the Commission

---

[84] U.S. SENTENCING COMM'N, SUMMARY REPORT: U.S. SENTENCING COMMISSION'S SURVEY OF ARTICLE III JUDGES app. B at B-7, app. C at C-7 (2002). The Commission's survey asked judges about their views regarding sentencing alternatives with respect to each offense category, rather than as a general matter. Also, the Commission's survey broke down the responses with respect to each alternative sentencing option; the percentage reflects the number of judges who supported at least one option. A probation-plus-confinement sentence is one where an offender receives probation plus a form of alternative confinement, such as home detention. A split sentence is one where an offender serves up to half of his sentence in prison and the balance on probation or under a form of alternative confinement.

[85] U.S. SENTENCING COMM'N, RESULTS OF SURVEY OF UNITED STATES DISTRICT JUDGES JANUARY 2010 THROUGH MARCH 2010 tbl. 11 (2010). The Commission's survey broke down the responses by drug type. Over half of district judges favored greater sentencing alternatives across all drug types, with the exception of heroin, where 47% of district judges voiced support for greater sentencing alternatives. As discussed in note 84, the survey also broke down the responses with respect to each alternative sentencing option, so the percentage reflects the number of judges who supported at least one option.

[86] *Id.*

[87] U.S. SENTENCING COMM'N, ANNUAL REPORT 1991 10 (1991); *see* Felman, *supra* note 80, at 3 ("Proposals to increase alternative sentencing options in the Guidelines date back nearly as far as the Guidelines themselves and have been the subject of considerable study."). The Practitioners Advisory Group, a standing advisory group of the Sentencing Commission, has also repeatedly urged the Commission to consider studying and supporting a broader range of alternatives to incarceration. Letter from Practitioners Advisory Group to Patti B. Saris, Chair, U.S. Sentencing Commission, at 7-8 (July 23, 2012) ("The PAG encourages the Commission . . . to explore . . . so-called 'diversion' programs and re-entry programs. . . . The Commission should also study and report on federal programs already in place that provide for pretrial diversion or deferred adjudication. . . . Some federal

held a two-day national symposium on alternatives to incarceration, which brought together judges, prosecutors, defense attorneys, and corrections officials at both the state and federal levels.[88] Although the symposium examined presentence programs, such as drug courts, the Commission subsequently amended the Guidelines to permit only a modest *post-sentence* drug treatment alternative to incarceration.[89] Among the limitations placed on that alternative is the requirement that the defendant have a Guidelines range equal to or lower than 12-18 months.[90] In my 18-plus years on the bench I may have had a drug trafficking defendant with a Guidelines range that low, but I cannot remember one.[91]

---

districts have been successfully experimenting with post-plea non-conviction dispositions on an informal basis, but it would encourage greater use of post-plea non-conviction dispositions if courts' authority to implement them was regularized."); Letter from Practitioners Advisory Group to Ricardo H. Hinojosa, Chair, U.S. Sentencing Commission, at 5-8 (July 10, 2007) ("The PAG urges the Commission to make consideration of a wider range of alternatives to imprisonment one of its priorities. Some of the alternatives can be implemented by the Commission itself. For others, the Commission can lend its expertise in the area of punishment and alternatives to punishment.").

[88]     *See* U.S. SENTENCING COMM'N, SYMPOSIUM ON ALTERNATIVES TO INCARCERATION (2008).

[89]     U.S. SENTENCING GUIDELINES MANUAL app. C, Vol. III, amend. 738 (2012); *id*. § 5C1.1 cmt. n.6.

[90]     *Id*.; *see* Margy Meyers, Incoming Chair, Federal Defender Sentencing Guidelines Committee & Marianne Mariano, Federal Public Defender for the Western District of New York, Testimony Before the United States Sentencing Commission (Mar. 17, 2010), at 14-15 ("Given the near-universal consensus by stakeholders – including the Attorney General – decrying the use of prison as the primary form of punishment and encouraging alternative sentences for more people, and the empirical research that supports such policies, we remain puzzled why this particular line, which has the potential to generate at best a marginal impact, was drawn. Although the proposed amendment is a step in the right direction, given the small numbers at issue, it will likely have a minimal effect on the prison population going forward."); Felman, *supra* note 80, at 10-11 ("We would . . . urge the Commission either to set no offense level ceiling on drug treatment alternatives or, at a minimum, to set offense level 16 [corresponding to a Guidelines range of 21-27 months] . . . as the ceiling for eligible offenders. . . . Because the proposal as currently formulated may have an impact on an exceedingly small number of offenders, it is essential that the Commission couple its amendment with a policy statement explaining that the drug treatment alternatives in the amendment are *not* intended to be exclusive or to 'occupy the field.' If the amendment were written or construed by courts to mean that alternatives to incarceration for drug treatment are *only* appropriate in the narrow class of cases subject to the amendment, then the amendment may well have the unintended effect of actually being a step backward in the expansion of drug treatment alternatives to incarceration.") (emphasis in original).

[91]     At first blush Justice Scalia's correct observation that "nickel and dime" criminal cases have been "pouring into the federal courts" in recent years, *Scalia: Routine Criminal Cases Clog Federal Courts*, *supra* note 64, appears to be in tension with my suggestion that too few defendants have Guidelines ranges low enough to qualify for the Commission's tepid post-sentence drug treatment alternative. But there is no such tension. As I explained in *Diaz*, by linking all drug trafficking Guidelines ranges to the harsh mandatory minimum sentences intended only for kingpins and managers, the Commission ensured that even "nickel and dime" drug traffickers would get lengthy and expensive Guidelines ranges. As for the rest of the criminal docket in this district and most others, the original

Federal alternatives to incarceration have now begun to sprout on their own, upon the initiative of individual districts. These programs hold great promise. Here in the Eastern District of New York, it feels good to witness and to have a small role in turnarounds like Leitch's, McDaniel's, and Nunez's. They are true success stories. But policy should be driven by data, not anecdotes.

Are alternatives to incarceration effective at reducing recidivism? Are they truly cost-effective? If these programs work, what models are best?[92] How can we improve existing programs? If judges like myself and Judge Gold were to receive training in how to conduct our regular sessions with defendants, would these programs produce better outcomes?

The answers to these questions are not likely to come from the growing number of federal courts that have established alternatives to incarceration on their own initiative. There is a compelling need for system-wide research. Experts in the field have already called upon the Commission to assess the cost-effectiveness of alternatives to incarceration.[93] The Commission should respond. It should also evaluate the federal presentence drug courts and other intensive

Commission's decision that every white collar offense belongs in the same category as crimes of violence when it comes to the availability of probation obliterated the Sentencing Reform Act's statutory preference for probationary sentences for low-level offenders. *See* note 15 and accompanying text. With those two strokes, the original Commission dedicated itself to severity. By doing so, it placed virtually the entire criminal docket in this district and others like it beyond the reach of the meager alternative to incarceration provision it buried deep in the commentary to U.S. SENTENCING GUIDELINES MANUAL § 5C1.1 (2012).

[92] I acknowledge that these alternatives to incarceration are not a panacea. I also acknowledge that they may raise problems of their own. Among the criticisms levied at drug courts, for example, are that they widen the net of the criminal justice system, they cherry pick their participants (effectively creating two systems of justice), and they treat those who fail out of the program more harshly than if they had never participated. *See, e.g.*, JUSTICE POLICY INSTITUTE, ADDICTED TO COURTS: HOW A GROWING DEPENDENCE ON DRUG COURTS IMPACTS PEOPLE AND COMMUNITIES (2011). These considerations all buttress the point that alternatives to incarceration need to be further studied.

[93] *See, e.g.*, Letter from Michael A. Livermore & Jennifer S. Rosenberg, Institute for Policy Integrity at NYU School of Law, to United States Sentencing Commission (July 16, 2012), *available at* http://policyintegrity.org/documents/IPI_Comments_to_Sentencing_Commission.pdf (attaching Jennifer Rosenberg & Sara Mark, *Balanced Justice: Cost-Benefit Analysis and Criminal Justice Policy*, POLICY BRIEF No. 11 (NYU School of Law, Institute for Policy Integrity & Center on the Administration of Criminal Law, Oct. 2011)).

supervision programs such as the SOS Program, which have many differences among them, to help us determine, on an empirical basis, how well they work generally and what works best.[94] In the meantime, the Commission should collect and disseminate information about these grassroots efforts to make federal sentencing more humane and cost-effective, and less destructive of our communities.

G.    *Conclusion*

I accept and indeed applaud the deferred prosecution agreement by which Leitch's charges will be dismissed entirely.  The 18-month period of supervision before that dismissal occurs will provide an ample opportunity for the United States Attorney (and the Court as well) to ensure that the faith placed in her by this result is deserved.  If she fails in that regard, appropriate punitive sanctions will be available.  As for McDaniel, the misdemeanor charge adequately reflects the seriousness of his crime.  I therefore accept the plea agreement, and he was sentenced to probation for the reasons set forth above.  Finally, Nunez's transformation from immature criminality to responsible adulthood earned him a sentence that does not include an unnecessary, destructive and exorbitantly expensive prison term.

John Gleeson, U.S.D.J.

Dated: February 28, 2013
         Brooklyn, New York

---

[94]    Each alternative to incarceration program is like a laboratory, bearing its own structural and substantive idiosyncrasies.  (As the descriptions of POP and the SOS Program reveal, even within this district, the programs are operated differently.)  Some of these idiosyncrasies may be a product of a particular district's unique characteristics.  But a comprehensive study of these programs is likely to reveal best practices.